290 A.2d 214.

RONALD L. MOLLEUR *v.* CITY DAIRY, INC. *et al.*

APRIL 28, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

---

KELLEHER, J. This negligence action arises out of a collision of two trucks on a public highway located in the city of Woonsocket. Trial was held before a Superior Court jury which returned a verdict for the plaintiff. The defendants' (the defendant driver and his employer) motion for a new trial was denied. This appeal ensued. Hereafter, when we refer to the defendant, we shall be referring to the defendant driver, Roland Michaud. What is said about the defendant driver applies equally to his employer.

The collision occurred in an area which is replete with one-way streets, traffic islands, traffic lights and pedestrian-crossing controls. We shall refer to three public highways, South Main, Bernon and Arnold Streets. They are all one-

way streets and they abut, or are close to, a municipal parking lot. Vehicular traffic circulates in a somewhat rotary fashion with the outer edges of the parking lot bounded by the circumferential roads. The lights and islands control and channel the flow of automotive traffic.

A motorist, travelling northerly along South Main Street, has a choice as he nears the intersection of Bernon Street. There is an overhead traffic signal hanging in the center of the intersection. Bernon Street runs in a westerly direction. The South Main Street motorist can proceed along that street or he can, by bearing left at a traffic island, travel in a westerly direction onto Bernon Street.

The motorist who is driving southerly on Arnold Street is also given a choice as he nears Bernon Street. He can "loop" to his left past a traffic island and travel north on South Main Street or he can bear right past a traffic island and come onto Bernon Street. Once on Bernon Street, he can encircle the lot and arrive on South Main Street, or he can continue westward onto Bernon Street. The Arnold Street motorist is confronted with three sets of lights. The driver who wishes to make a left turn takes his direction from a set of lights that are located on the island that channels traffic onto South Main Street. The operator who wishes to go onto Bernon Street sees two sets of lights. One set is on the westerly curb of Arnold Street about 20 feet back from where Bernon and Arnold Streets meet. The green portion of this set of lights is an arrow. The third set of lights is located on the island which permits the South Main Street motorist to come onto Bernon Street. It has the green circular disk.

Traffic proceeding westerly along Bernon Street, as it nears South Main Street, is controlled by the overhanging set of lights already described. A motorist driving westerly on Bernon Street can either turn right onto South Main Street or continue past Arnold Street. The distance between

the South Main and Bernon Streets intersection and the spot where Bernon and Arnold Streets merge is approximately 100 feet.

The plaintiff Molleur is employed by the New England Telephone Company. He installs and repairs phones. The defendant Michaud works as a driver-salesman for City Dairy, Inc. Each man's job requires him to drive a truck furnished by his employer.

At approximately eight o'clock on the morning of November 16, 1966, Molleur was driving the telephone truck southerly on Arnold Street. He was going to follow the circular route around the municipal lot and go to a hardware store that is located on South Main Street close to the intersection of Bernon Street. The arrow on the sidewalk set of lights and the light on the further island were green. As Molleur came to the sidewalk light, he looked to his left and observed a car stopped on Bernon Street waiting for the westward light to change from red to green. The car was in the lane that was closest to the southerly curb of Bernon Street. Molleur continued past the set of lights going towards his right on his way to Bernon Street so that he could eventually encircle the lot and make his stop at the hardware store. Molleur estimated that as he proceeded to make his turn onto Bernon Street, he was going between 7 and 9 miles an hour. The telephone truck never arrived at its destination.

Michaud testified that he was driving westerly on Bernon Street. As he approached the rear of the car stopped at the South Main-Bernon red light, the light changed. Michaud swung around the car and proceeded across the intersection at a speed which he estimated to be about 20 miles an hour. He admitted that once he crossed South Main Street, he could see plaintiff coming down Arnold Street onto Bernon Street. The left front of the phone company's truck struck near the right hand door of the milk truck.

The force of the collision turned the phone truck around so that it was facing Arnold Street. The driver-salesman testified that he was on his way to a customer's restaurant located on the northerly side of Bernon Street at a point somewhere beyond Arnold Street. He conceded that at no time, after he passed the overhanging traffic signal, did he ever reduce his speed. He also said that he had traveled this route many times and he was aware that when the overhead light was green for the Bernon Street traffic, the Arnold Street light was also green.

One other witness's testimony should be noted. He is Roger Gagne. Gagne, on the day and time in issue, was on his way to the local Army recruiting station to enlist.[1] He was standing on the island that guides the South Main Street traffic onto Bernon Street. He took two steps out onto Bernon Street when he saw the milk truck coming at him. Gagne retreated to his island sanctuary. He estimated the truck's speed at 30 miles an hour. He also stated that just before the collision, he saw the telephone truck coming down Arnold Street at a "fairly slow" rate of speed.

The defendant, in arguing in support of his motion for a directed verdict, relied on two cases often cited and relied upon by most defendants involved in intersectional collisions. They are *Dembicer* v. *Pawtucket Cabinet & Builders Finish Co.*, 58 R. I. 451, 193 A. 622 (1937), and *Keenan* v. *Providence Journal Co.*, 52 R. I. 54, 157 A. 302 (1931). They embody the well-established rule that a plaintiff who heedlessly runs into danger, seen or unseen, is guilty as a matter of law of contributory neglience. The rule is clear but its proper application depends upon the facts presented in each individual case. *Almy* v. *Vien*, 87 R. I. 479, 143 A.2d 143 (1958).

The *Keenan* case stands for the proposition that it avails

---

[1] When this case came to trial in January, 1971, Gagne, after completion of a three-year enlistment, had been honorably discharged from the Army.

a plaintiff nothing to say that he looked and saw nothing at a point, where, if he had looked, he must have seen what was there. *Dembicer* also echoes this sentiment. However, defendant does not benefit from these two cases because a glance at the facts of each case shows that the intersection in each case was one of a nice, neat, ninety-degree angle variety. *Keenan* speaks of a "right angle" intersection while *Dembicer* referred to a driver "intending to cross an intersection." Both cases were written at a time when the science of traffic engineering had not attained the status and recognition it enjoys today.

The traffic pattern fashioned on Arnold Street makes both *Keenan* and *Dembicer* inapposite. Once Molleur had passed the green arrow and looked to his left, he was, thanks to the artistry of the traffic engineer, being funneled away from the traffic that might proceed down Bernon Street past Arnold Street. Having in mind the location of the green arrow, the presence of the traffic island, Molleur's slow speed as he went from Arnold to Bernon Street, Michaud's approach to the South Main Street intersection and his 20 to 30 mile per hour dash to Arnold Street and looking at all other factors in a light most favorable to plaintiff, as we must on a motion for direction, we conclude that Molleur was not guilty of contributory negligence.

The trial justice's decision on the motion for a new trial, particularly as it referred to the issue of liability, is a model of brevity. He found that a typical question of fact confronted the jury and that its finding as to liability "* * * was one that reasonable men could have reached after due consideration of the negligence and the contributory negligence doctrines." Had the trial justice said no more, we would quickly dispose of defendant's argument that the trial court failed to make an independent judgment by weighing the evidence and passing on the credibility of witnesses. In *State* v. *Tate,* 109 R. I. 586, 288 A.2d 494 (1972),

we pointed out that the trial justice is afforded wide latitude with respect to the form of his decision. He need not make an exhaustive analysis of the evidence. Implicit in the trial justice's remarks made in the case at bar is his conclusion that the evidence adduced was such that reasonable men could differ as to Molleur's contributory negligence and Michaud's negligence. The trial justice, however, did not stop here but went on to observe that Gagne's testimony might have persuaded the jury to return a plaintiff's verdict. The pedestrian, said the trial justice, "* * * depicted a milk truck, possibly heavily loaded, and covering a route, passing him at about thirty miles an hour and possibly going through a red light very shortly before the accident."

This last remark represents a misconception of evidence. Nowhere did the pedestrian ever speak of the milk truck's cargo, and, although at one point Gagne described defendant as going through the red light, he later made it quite clear that he had no idea whether the signal controlling the South Main-Bernon intersection was red or green.

The trial justice having misconceived material evidence, it becomes our duty to examine the record and grant a new trial if the evidence, as we view it, strongly preponderates against the verdict. In making this determination, we cannot, because of the cold record, weigh the evidence or pass on the credibility of witnesses. We may only look to the record to determine whether there is any competent evidence which, if believed, would support the jury's finding. *Gilbert* v. *Girard,* 109 R. I. 68, 279 A.2d 919 (1971); *Landes* v. *Faella,* 106 R. I. 23, 255 A.2d 724 (1969).

We turn then to the evidence. As noted earlier, there was credible evidence which would warrant a finding by the jury that Molleur was in the exercise of due care. We think that Michaud's conceded failure to reduce his speed even though he observed Molleur coming from Arnold to Bernon

Street is sufficient to justify a finding of negligence on his part.

The final phase of defendant's appeal concerns two objections he lodged to what the trial justice said in his charge to the jury.

The sole medical witness was a board-certified orthopedist who had treated Molleur for a cervical sprain and attendant pain which the surgeon attributed to the collision. Molleur had testified that he did not begin to experience the pain until February, 1967. He was hospitalized for a period of two weeks in May, 1967 and thereafter remained off the job until late October, 1967.

When the trial justice came to that point where he spoke about the medical testimony, he commenced his remarks by stating, "Now, during the trial we had one expert witness, [a] very good one, Dr. Guay." The defendant contends that the trial justice, by describing the surgeon in such glowing terms, has told the jury that he accepts as true any and all testimony given by this witness. We cannot agree that the court, by calling Dr. Guay a "good witness," had trespassed within the exclusive province of the jury.

Although the trial justice's choice of words leaves much to be desired, once his preliminary remarks are placed within the context of the entire portion of the charge, it becomes quite evident that the court made it clear to the jury that it was they, not he, who were to evaluate what the surgeon told them. Once the trial justice had adverted to what a "good" witness the jury had heard, he informed the panel that they were to be enlightened but not bound by what the expert had told them. He also emphasized that the jury should consider his opinion in the same manner as they would judge the testimony of any other witness. When this portion of the charge is considered in its entirety, it is ob-

vious that the jury was told that it was up to them to appraise the testimony gven by plaintiff's doctor.

The record shows that the doctor listed his findings, treatments and conclusions in a very frank, direct and dispassionate manner. He attributed Molleur's pain, hospitalization and subsequent loss of earning capacity to the November 1966 collision but he was quick to add that his conclusions were based upon the history given him by the patient and subject to the condition that there had been no intervening injury. He said that when he had last seen Molleur in February, 1969, his patient complained of a mild neck pain. When informed that Molleur had fallen off a pole in September, 1968, the witness replied that he had not been informed of this incident during the patient's last visit. The doctor readily concurred with defense counsel's observation that the 1966 injury received by Molleur during the collision which caused the subsequent pain, hospitalization and incapacity was "minimal." The physician gave an objective report listing the strength and weakness of his patient's claim for damages. Thereafter, it was up to the jury to give his testimony the weight they thought it deserved. We see nothing in the trial justice's gratuitous comment that inhibited them from doing their job. We must, therefore, sustain the denial of the motion for a new trial.

The defendant's last argument concerns the charge given the jury relative to each driver's duty to yield the right of way to the other. In speaking of Molleur, the jury was instructed that even though he had the green arrow or light and was free to turn to the right, he still had to yield the right-of-way to any vehicle lawfully within the intersection at the time the green light was showing. The trial justice also told the jury that if they found that, as Michaud approached the intersection of Bernon and Arnold Streets, there was no traffic control regulating his westward passage,

then Michaud was bound to yield the right-of-way to Molleur.

The defendant points out that the first portion of the charge embodies the essence of G. L. 1956 (1968 Reenactment) §31-13-6(a)(1), as amended by P. L. 1963, ch. 81, §1.[2] Such an instruction, he says, is perfectly correct because it is applicable to an intersection where the entry to or departure from is controlled by a traffic light. He contends, however, that the court erroneously imposed a duty on Michaud because of the classic obligation to yield the right-of-way to the motorist approaching from the right applies only in an instance when there is an uncontrolled intersection. He cites §31-17-1(b)[3] and points out that it is inapplicable since the junction of Bernon and Arnold Streets is a controlled intersection because of the presence of the traffic lights that are situated on the westerly sidewalk of Arnold Street and on the island that funnels South Main Street traffic onto Bernon Street.

We think that the charge relative to a controlled intersection is not applicable to Michaud.

Molleur was under a duty to yield the right-of-way to Michaud only if, at the time the light had turned green, the dairy truck was in the intersection. The record shows with unquestionable clarity that as the telephone truck made its way past the green arrow, the dairy truck was somewhere east of the South Main-Bernon Street light at a spot at least 100 feet from where Bernon and Arnold Streets meet.

---

[2] "31-13-6(a)(1). Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited."

[3] "When two vehicles enter an intersection from different highways at approximately the same time the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right."

The controlled intersection rule was not applicable as Michaud, who being completely indifferent to the oncoming telephone truck, continued his headlong dash towards the restaurant.

The defendants' appeal is denied and dismissed.

*Goldman, Grady & Biafore, John D. Biafore,* for plaintiff.

*Higgins, Cavanagh & Cooney, Kenneth P. Borden,* for defendants.